**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X  Case No.: 22-cv-02514
DAVID THOMAS and AMBONIQUE THOMAS,

Plaintiffs,

**COMPLAINT**

-against-


NISSAN MOTOR ACCEPTANCE COMPANY LLC
and SMITHTOWN NISSAN INC.,

Defendants.

------------------------------------------------------------------X

Plaintiffs, by and through their attorneys, FAGENSON & PUGLISI,

PLLC, upon knowledge as to themselves and their own acts, and as to all other

matters upon information and belief, bring this complaint against above-named

defendants and in support thereof allege the following:

INTRODUCTION

1.      Defendant, Smithtown Nissan Inc. (the "Dealership") has

demonstrated throughout the years some of the worst conduct of car dealerships so

disliked by members of the public and has coupled this misconduct with a remarkable

incapacity to abide by lawful settlement agreements entered into with the State of New

York.

2.      The New York State Attorney General launched an investigation

action against the Dealership which was precipitated by complaints from members of the

public that the Dealership, among other things, secretly included unwanted and unordered

1

add-on products and services into their car purchases. Said investigation was settled in 2004. However, in 2009, the Attorney General was forced to commence yet another enforcement action against the Dealership for many of the same deceptive acts and practices as precipitated the prior investigation.

3.      The Dealership's misconduct towards plaintiffs shows that the Dealership has not learned from either of the Attorney General's prior enforcement actions.

4.      Automobile dealers and finance companies that perpetrate these fraudulent, abusive and oppressive acts on unsophisticated and unsuspecting consumers are bound to cause and do cause increased financial burdens and feelings of distress and helplessness in consumers, who often do not know what to do when a calamity such as this befalls them.

5.      Having been able to obtain no relief from defendants, plaintiff brings this action to right defendants' wrongs.

6.      Plaintiffs bring this action seeking damages against the Dealership pursuant to the federal Truth in Lending Act (or "TILA"), 15 U.S.C. § 1601 *et seq*.; injunctive relief and damages against defendants pursuant to New York General Business Law ("NYGBL") §§ 349-350 for defendants' deceptive acts and practices and false advertising; damages against defendants for common-law fraud; relief against defendants pursuant to New York Motor Vehicle Retail Instalment Sales Act ("MVRISA")–New York Personal Property Law § 301 *et seq*.; and damages against NMAC pursuant to NYGBL § 349 for deceptive acts and practices.

<u>JURISDICTION AND VENUE</u>

7.      Plaintiffs re-allege paragraphs 1-6 as if fully re-stated herein.

8.      This Court has federal jurisdiction pursuant to the Truth in Lending Act, 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same set of transactions forming the basis of the federal claims.

9.      This Court has venue pursuant to 28 U.S.C. § 1391(b) in that a substantial portion of the events or omissions giving rise to this action occurred in this District.

<u>PARTIES</u>

10.     Plaintiffs re-allege paragraphs 1-9 as if fully re-stated herein.

11.     Plaintiffs are natural persons who at all relevant times resided in Kings County, State of New York.

12.     Plaintiff David Thomas is the father of plaintiff Ambonique Thomas.

13.     Upon information and belief, defendant Nissan Motor Acceptance Company LLC ("NMAC") was at all relevant times and is a foreign limited liability company organized and existing under the laws of the State of California.

14.     Upon information and belief, NMAC was and is duly authorized to do business and doing business in the State of New York.

15.     Defendant Smithtown Nissan, Inc. (or the "Dealership") is a domestic business corporation with a principal place of business in the Kings County, State of New York.

16. The Dealership is a retail dealer in new and used automobiles.

17. Plaintiff entered into a consumer credit transaction with the Dealership as contemplated by 15 U.S.C. § 1602(i), in that the money, property or services which were the subject of the transaction were primarily for personal, family or household purposes.

18. The Dealership is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(a)(17) because at all relevant times the Dealership, in the ordinary course of its business, regularly extended consumer credit which is payable in more than four installments or for which the payment of a finance charge is or may be required, and the Dealership is the person to whom the debt arising from the consumer credit transaction was initially payable.

19. The consumer transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

20. The Dealership assigned plaintiff's retail installment contract (or "RIC") to NMAC.

21. NMAC is liable to plaintiff for its own misconduct and, by virtue of the Holder Rules, is jointly and severally liable with the Dealership to plaintiff for the misconduct of the Dealership herein.

## FACTUAL ALLEGATIONS

22.     Plaintiffs re-allege paragraphs 1-21 as if fully re-stated herein

23.     In April 2021, the Dealership advertised for sale a 2019 Nissan Altima automobile bearing vehicle identification number 1N4BL4BV1KC238771 (the "Vehicle").

24.     In April 2021, the Dealership advertised the Vehicle for sale online.

25.     In April 2021, the Dealership advertised the Vehicle for sale on CarFax.com.

26.     In April 2021 in the online advertisement, the Dealership advertised the sale price of the Vehicle as $15,550.

27.     In April 2021, the Dealership advertised the Vehicle for sale online for a price of $15,550.

28.     In April 2021, in the advertisement on CarFax.com, the Dealership advertised the sale price of the Vehicle as $15,550.

29.     In April 2021, in the advertisement on CarFax.com, the Dealership stated:- "Dealer Disclaimer: Price includes all costs except for title fees, registration fees and taxes."

30.     In the advertisement, the Dealership stated that the Vehicle was a "Certified Pre-Owned" vehicle.

31.     A copy of the online advertisement is attached hereto as **Exhibit 1**.

32.     Upon viewing the Vehicle online, plaintiffs visited the Dealership on April 30, 2021.

33. At the Dealership, plaintiffs were approached by "Joe" Batista.

34. On April 30, 2021, Joemanuel Batista was a salesman at the Dealership.

35. On April 30, 2021, Joemanuel Batista was a salesman at the Dealership who dealt with plaintiffs.

36. On the date of the commencement of this action, Joemanuel Batista is a salesman at the Dealership.

37. On the date of the commencement of this action, Joemanuel Batista is an employee at the Dealership.

38. Plaintiffs informed Batista that they were at the Dealership to view the Vehicle which they had seen advertised online.

39. Batista showed plaintiffs the Vehicle.

40. Plaintiffs noted that the price of $15,550 was displayed on a window sticker on the Vehicle.

41. On April 30, 2021, the price of $15,550 was displayed on a window sticker on the Vehicle.

42. Plaintiff saw only one window sticker on the Vehicle.

43. On April 30, 2021 when plaintiffs viewed the Vehicle there was no Buyers Guide displayed on it.

44. Plaintiffs confirmed that the vehicle in the Carfax advertisement was the vehicle which Batista showed to them.

45. After a test drive, plaintiffs informed Batista that they wished to

purchase the Vehicle.

46. Batista then removed the window sticker from the Vehicle.

47. Batista did not give plaintiffs the window sticker which he removed from the Vehicle.

48. Batista then showed plaintiffs into the Dealership.

49. There, Batista added the customary fees and sales tax to the price of $15,550 then informed plaintiffs that the final price of the Vehicle was $19,190.

50. Batista informed plaintiffs that the "out-the-door" price of the Vehicle was $19,190.

51. Batista did the addition on a sheet of paper and showed plaintiffs said sheet of paper and the final price of $19,190 which he had written thereon.

52. Thereafter, with the assistance of Batista, plaintiffs arranged insurance for the Vehicle.

53. After plaintiffs arranged the insurance, Batista told plaintiffs to wait for the finance team to attend to them in order to complete the purchase.

54. After plaintiffs waited for a while, Hasina ("Sina") Abdul Karim approached plaintiffs and introduced herself.

55. On April 30, 2021, Hasina Abdul Karim was a finance manager at the Dealership.

56. On April 30, 2021, Hasina Abdul Karim was the finance manager at the Dealership who dealt with plaintiffs.

57. On the date of the commencement of this action, Hasina Abdul

Karim is a finance manager at the Dealership.

58.     On the date of the commencement of this action, Hasina Abdul Karim is an employee at the Dealership.

59.     Sina showed plaintiffs into an office.

60.     Plaintiffs informed Sina that they wished to make a down payment of $8,000.

61.     Plaintiff David Thomas gave to Sina his Discover credit card and Sina charged his card in the amount of $8,000.

62.     A copy of the receipt for plaintiffs' $8,000 down payment is attached hereto as **<u>Exhibit 2</u>**.

63.     At this point, it was after 8:00 p.m., as can be seen from Exhibit 2 which shows a time of 20:05 or 8:05 p.m.

64.     This was well past the Dealership's posted closing time on April 30, 2021, which was 7:00 p.m.

65.     After their payment of $8,000, plaintiffs expected that the amount to be financed would be no more than $11,190.

66.     Sina asked plaintiffs to sign certain documents.

67.     Sina asked plaintiffs to sign the documents on an electronic device similar to a tablet.

68.     Sina instructed plaintiffs to use their finger to sign directly on the screen of the device.

69. The screen was blank except for where Sina instructed plaintiffs to sign.

70. Plaintiffs were not able to read on the screen the documents which Sina instructed them to sign.

71. Sina did not explain the documents to plaintiffs.

72. During plaintiffs' signing of the screen, Sina told plaintiffs that the Vehicle "comes with" an extended warranty.

73. At no point did Sina tell plaintiffs that the extended warranty was at an additional charge or what that additional charge was.

74. Plaintiffs had not asked the Dealership for an extended warranty or for any additional service or product.

75. Plaintiffs did not need an extended warranty or any additional service or product.

76. As the Vehicle was a 2-year-old car with only just over 10,000 miles and the manufacturer's warranties would still be on the Vehicle, plaintiffs saw no reason to purchase additional services or products for the Vehicle.

77. Since plaintiffs had not asked for an extended warranty and since Sina did not mention any additional charge for one, plaintiffs believed that the extended warranty of which Sina spoke was already included in the $19,190 final price of the Vehicle.

78. Sina did not mention to plaintiffs any product or service, apart from the extended warranty.

79. Sina kept hurrying plaintiffs to sign, repeatedly telling plaintiffs to "sign here" while indicating, and repeatedly telling plaintiffs that the Dealership's closing time had passed.

80. Sina had control of and operated the mouse, and would move the pages on the screen after each time plaintiffs signed.

81. Sina also instructed plaintiffs to sign a few times on paper.

82. Sina likewise did not explain to plaintiffs what the documents were about or for.

83. Plaintiffs could not read the documents because, as afore-mentioned, Sina kept telling plaintiffs to hurry and sign because the Dealership was already closed.

84. Sina kept hold of each of the documents while she instructed plaintiffs where to sign and while plaintiffs signed.

85. Plaintiffs did not have possession of the documents which they were signing.

86. After plaintiffs signed each document, Sina removed it from plaintiffs' reach.

87. At no point while plaintiffs were in her office did Sina inform plaintiffs that the final price of the Vehicle would be anything other than the $19,190 which Batista had already told plaintiffs.

88. After plaintiffs signed all documents which Sina asked them to sign, Sina handed an envelope to plaintiff David Thomas and ushered plaintiffs out of the Dealership.

89.     While plaintiffs were leaving the Dealership that evening, they noticed that there were no other customers still at the Dealership and that the Dealership was indeed closed.

90.     By the time plaintiffs walked out of the Dealership, it was well after 8:00 p.m.

91.     After arriving home, plaintiffs for the first time opened the envelope which Sina had given to them and looked over the documents which she had placed therein.

92.     Plaintiffs noticed that there were just a few sheets of paper in the envelope.

93.     Sina did not give plaintiffs an MV-50 Certificate of Sale.

94.     Sina did not give plaintiffs an Odometer and Damage Disclosure Statement.

95.     Sina did not give plaintiffs a Bill of Sale or Invoice.

96.     Sina did not give plaintiffs any document evidencing the certification status of the Vehicle as a certified pre-owned car.

97.     Sina did not give plaintiffs a Statement of Certification.

98.     Sina did not give plaintiffs a certified pre-owned inspection checklist or report.

99.     Sina did not give plaintiffs a certified pre-owned warranty booklet.

100.    Sina did not give plaintiffs a Buyers Guide for the Vehicle.

101.    Sina did not give plaintiffs a New York State Lemon Law Warranty.

102.    Sina did not give plaintiffs a New York State Lemon Law Bill of Rights.

103.    Plaintiffs saw in the envelope one sheet of paper titled retail installment contract ("RIC").

104.    A copy of said sheet of paper–page 1 of the RIC–is attached hereto as **<u>Exhibit 3</u>**.

105.    Upon review of Exhibit 3, plaintiffs saw that the "Cash Price (Incl. Acc.)" of the Vehicle was listed as $25,139.98.

106.    This number shocked plaintiffs, since Batista had told them that the final price of the Vehicle was $19,190, before deduction of their $8,000 down payment.

107.    Plaintiffs did not know to what "Incl. Acc." referred, nor indeed what it meant.

108.    Upon further review of this Exhibit 3, plaintiffs noticed that a purported $450 rebate was added to the $8,000 down payment and both, along with a documentation fee of $75, were deducted from the $25,139.98.

109.    To the resulting balance of $16,764.98, the Dealership charged plaintiffs $1,500 for "Paid to "Nesna for Maintenance".

110.    The Dealership also charged plaintiff $3,500 for "Paid to "Nesna for Service Contract".

111.    After the Dealership added $205 for registration fee, $37 for inspection fee and $2,674.92 for sales tax, the total "Amount Financed" was $24,681.90.

112.    The Dealership added sales tax of $2,674.92 to the cost of the Vehicle.

113.    Plaintiffs also noticed in the envelope a sheet of paper titled "Vehicle Service Contract (VSC)", "Application/Declaration".

114.    A copy of said sheet of paper is attached hereto as **Exhibit 4**.

115.    As can be seen from Exhibit 4, the "VSC Purchase Price" was $3,500.

116.    Plaintiffs' purported signatures appear on Exhibit 4 alongside the date of Exhibit 4 of "04/29/2021".

117.    Exhibit 4 also states that the "Date Of Purchase" of the vehicle service contract was "04/29/2021".

118.    Plaintiffs did not visit the Dealership on April 29, 2021.

119.    Plaintiffs did not sign any papers regarding the Vehicle on April 29, 2021.

120.    Plaintiffs did not sign Exhibit 4.

121.    Plaintiffs' signatures on Exhibit 4 are false.

122.    Plaintiffs' signatures on Exhibit 4 are fabricated.

123.    The Dealership charged plaintiffs a price of $3,500 for a vehicle service contract.

124.    As afore-mentioned, plaintiffs did not request or want a service contract.

125.    Sina did not inform plaintiffs that the Dealership was imposing on

their purchase of the Vehicle a service contract at a charge to them of $3,500.

126.    The Dealership imposed the vehicle service contract at a charge to plaintiffs of $3,500 without plaintiffs' knowledge or consent.

127.    Plaintiffs also noticed in the envelope a sheet of paper titled "Prepaid Maintenance Agreement (PMA)", "Application/Declaration".

128.    A copy of said sheet of paper is attached hereto as **Exhibit 5**.

129.    As can be seen from Exhibit 5, the "PMA Purchase Price" was $1,500.

130.    Plaintiffs' purported signatures appear on Exhibit 5 alongside the date of Exhibit 5 of "04/29/2021".

131.    Exhibit 5 also states that the "Purchase Information" of the maintenance agreement was "04/29/2021".

132.    Plaintiffs did not visit the Dealership on April 29, 2021.

133.    Plaintiffs did not sign any papers regarding the Vehicle on April 29, 2021.

134.    Plaintiffs did not sign Exhibit 5.

135.    Plaintiffs' signatures on Exhibit 5 are false.

136.    Plaintiffs' signatures on Exhibit 5 are fabricated.

137.    The Dealership charged plaintiffs a price of $1,500 for a maintenance agreement.

138.    As afore-mentioned, plaintiffs did not request or want a maintenance agreement.

139.    Sina did not inform plaintiffs that the Dealership was imposing on their purchase of the Vehicle a maintenance agreement at a charge to them of $1,500.

140.    The Dealership imposed the maintenance agreement at a charge to plaintiffs of $1,500 without plaintiffs' knowledge or consent.

141.    Plaintiffs also noticed in the envelope a sheet of paper titled "Total Protection Wrap Declarations Page".

142.    A copy of said sheet of paper is attached hereto as **Exhibit 6**.

143.    As can be seen from Exhibit 6, the "Guarantee Purchase Price" was $499.98.

144.    Plaintiffs' purported signatures appear on Exhibit 6 alongside the date of Exhibit 6 of "04/29/2021".

145.    Exhibit 6 also states that the "Guarantee Purchase Date" of the total protection wrap agreement was "4/29/2021".

146.    Plaintiffs did not visit the Dealership on April 29, 2021.

147.    Plaintiffs did not sign any papers regarding the Vehicle on April 29, 2021.

148.    Plaintiffs did not sign Exhibit 6.

149.    Plaintiffs' signatures on Exhibit 6 are false.

150.    Plaintiffs' signatures on Exhibit 6 are fabricated.

151.    The Dealership charged plaintiffs a price of $499.98 for a total protection wrap agreement.

152.    The price of the total protection wrap agreement was not itemized in the RIC.

153.    As afore-mentioned, plaintiffs did not request or want a total protection wrap agreement.

154.    Sina did not inform plaintiffs that the Dealership was imposing on their purchase of the Vehicle a total protection wrap agreement at a charge to them of $499.98.

155.    The Dealership imposed the total protection wrap agreement at a charge to plaintiffs of $499.98 without plaintiffs' knowledge or consent.

156.    In addition, as can be seen from Exhibit 6, the "Vehicle Purchase Price" was $19,190, as plaintiffs had agreed with Batista.

157.    Plaintiffs also noticed in the envelope a sheet of paper titled "Key Replacement Vehicle Service Agreement Schedule Page".

158.    A copy of said sheet of paper is attached hereto as **Exhibit 7**.

159.    As can be seen from Exhibit 7, the "Agreement Purchase Price" was $683.

160.    Plaintiffs' purported signatures appear on Exhibit 7 alongside the date of Exhibit 7 of "04/29/2021".

161.    Exhibit 7 also states that the "Agreement Purchase Date" of the key replacement vehicle service agreement was "4/29/2021".

162.    Plaintiffs did not visit the Dealership on April 29, 2021.

163.    Plaintiffs did not sign any papers regarding the Vehicle on April 29,

2021.

164.   Plaintiffs did not sign Exhibit 7.

165.   Plaintiffs' signatures on Exhibit 7 are false.

166.   Plaintiffs' signatures on Exhibit 7 are fabricated.

167.   The Dealership charged plaintiffs a price of $683 for a key replacement vehicle service agreement.

168.   The price of the key replacement vehicle service agreement was not itemized in the RIC.

169.   As afore-mentioned, plaintiffs did not request or want a key replacement vehicle service agreement.

170.   Sina did not inform plaintiffs that the Dealership was imposing on their purchase of the Vehicle a key replacement vehicle service agreement at a charge to them of $683.

171.   The Dealership imposed the key replacement vehicle service agreement at a charge to plaintiffs of $683 without plaintiffs' knowledge or consent.

172.   In addition, as can be seen from Exhibit 7, the "Vehicle Purchase Price" was $19,190, as plaintiffs had agreed with Batista.

173.   The total cost for the aforesaid four additional products and services was $6,182.98, plus the increased sales tax related to the $6,182.98.

174.   Plaintiffs also noticed in the envelope a sheet of paper titled "Odometer and Damage Disclosure Statement".

175.   Said sheet of paper has no has none of the blank spaces filled in.

176. A copy of said sheet of paper is attached hereto as **Exhibit 8**.

177. The Dealership assigned the RIC to NMAC.

178. Plaintiffs noticed that the first loan payment was due on June 14, 2021.

179. Plaintiffs realized that the reason that the "Amount Financed" was $24,681.90, and not $11,190 as they had calculated, was that the Dealership had added afore-mentioned products and services to their purchase without their knowledge or consent.

180. As afore-mentioned, plaintiffs had agreed with Batista to purchase the Vehicle for the advertised price of $15,550, plus all customary taxes and fees, for the total out-the-door price of $19,190.

181. The four afore-mentioned additional products and services cost plaintiffs no less than $6,730 including tax.

182. The Dealership did not sell plaintiffs the Vehicle for the advertised price of $15,550.

183. The Dealership did not sell plaintiffs the Vehicle for the out-the-door price of $19,190.

184. The Dealership did not sell plaintiffs the Vehicle for the final price of $19,190.

185.     Plaintiffs did not want, and saw no reason to purchase, any additional products and services, since the Vehicle was a certified pre-owned two-year-old car with just a little over 10,000 miles and with the manufacturer's warranties still intact.

186.     Plaintiffs were immediately distressed, upset and their blood pressure rose at the Dealership's fraud in secretly adding the products and services to their purchase of the Vehicle.

187.     Plaintiffs would not have purchased the Vehicle had the Dealership informed them that it was adding the products and services to their purchase of the Vehicle.

188.     The next day, May 1, 2021, plaintiff David Thomas contacted Sina and informed Sina that plaintiffs had agreed with Batista to purchase the Vehicle for the advertised price of $15,550, plus all customary taxes and fees.

189.     Plaintiff David Thomas informed Sina that he noticed that the actual sale price of the Vehicle was $25,139.98.

190.     As afore-mentioned, this $25,139.98 was before the addition of the unwanted service contract for $3,500 and maintenance agreement for $1,500, and before addition of taxes and fees, then deduction of $8,450 for plaintiffs' down payment and the purported rebate.

191.     Plaintiff David Thomas informed Sina that plaintiffs would return the Vehicle unless the error in the numbers was corrected.

192.     Sina invited plaintiffs to return to the Dealership so she could "go

over the numbers" with them.

193.    Sina informed plaintiff David Thomas that the office was closed for that weekend, and she worked at a different dealership on certain days so the first available date which she suggested to plaintiff was May 5, 2021.

194.    Plaintiffs agreed and returned to the Dealership on May 5, 2021.

195.    Plaintiffs drove the Vehicle to the Dealership.

196.    There, plaintiffs waited almost an hour past the appointed time for Sina to attend to them.

197.    Then, Sina approached plaintiffs and invited plaintiffs to the office of a gentleman who she informed plaintiffs was her manager.

198.    Plaintiffs explained to Sina and her manager that plaintiffs had visited the Dealership based on the online advertisement in which the price of the Vehicle was $15,550, plus sales tax, registration fees and title fees.

199.    Plaintiffs further explained to Sina and her manager that they had agreed with Batista to purchase the Vehicle for $15,550, plus sales tax, registration fees and title fees for a total out-the-door price of $19,190.

200.    Plaintiffs further explained to Sina and her manager that as they had paid down $8,000 the loan amount should have been no greater than $11,190.

201.    Plaintiffs reminded Sina and her manager that plaintiffs had neither asked for nor wanted any additional product or service.

202.    Plaintiffs informed Sina and her manager that plaintiffs did not wish to pay for any additional product or service.

203.     Plaintiffs asked Sina and her manager to remove the additional products and services from the purchase, since Sina had added them without plaintiffs' knowledge or consent.

204.     Sina and her manager informed plaintiffs that the advertisement was "not a part of the deal" and that the Dealership would not honor the price in the advertisement.

205.     Sina and her manager further informed plaintiffs that the additional products and services were necessary because plaintiffs had financed the purchase, the bank needed to protect its investment with the products and services should anything happen to the Vehicle and the products and services were part of the bank's "security".

206.     Sina and her manager further informed plaintiffs that the additional products and services "come with the car", plaintiffs "have to take them" and the Dealership could not remove the additional products and services.

207.     Plaintiffs then informed Sina and her manager that they would pay in cash the entire balance of $11,190 which remained after their down payment of $8,000.

208.     Plaintiffs informed Sina and her manager that they would pay the $11,190 right then and there.

209.     Plaintiffs did not request credit for the purported $450 rebate but instead told Sina and her manager that they would pay the full $11,190 balance of the purchase price.

210.     Sina and her manager told plaintiffs that the loan paperwork had

already been sent to the bank and therefore plaintiffs could not pay in cash for the balance of the purchase price.

211.    As a last-ditch attempt to salvage the matter such that they were not forced to pay almost $7,000 with tax and before interest for unwanted and unrequested additional products and services, plaintiffs told Sina and her manager that plaintiffs no longer wanted the Vehicle and that the Dealership should return to them their $8,000 down payment.

212.    Sina and her manager repeated to plaintiffs that the paperwork had already been sent to the bank, and told plaintiffs that the Dealership could not take back the Vehicle, that plaintiffs would lose their down payment if they surrendered the Vehicle and that the bank would consider it to be a repossession.

213.    Upset, plaintiffs told Sina and her manager that plaintiffs believed the Dealership had defrauded them, since no-one at the Dealership had mentioned to plaintiffs that they had to purchase add-on products and services in order to finance their purchase of the Vehicle.

214.    Plaintiffs left the Dealership.

215.    Thereafter, plaintiffs received from NMAC a "Retail Agreement Correction Notice".

216.    A copy of said Retail Agreement Correction Notice is a hereto as **Exhibit 9**.

217.    In Exhibit 9, the Amount Financed remained unchanged at $24,681.90.

218. In Exhibit 9, the annual percentage rate on the loan was now 2.490%; the finance charge was now $1,607.70; the monthly payment amount was now $438.16; the total payments was now $26,289.60; and the total sale price was now $34,739.60.

219. Thereafter, on or about June 7, 2021, plaintiffs telephoned NMAC to seek NMAC's assistance with the loan and the Dealership.

220. Plaintiffs informed NMAC that they had agreed with the Dealership to purchase the Vehicle for the price of $15,550, and after taxes and dealer fees the final agreed price was $19,000 "and change".

221. Plaintiffs informed NMAC that instead of the $19,000 "and change" total price that they had agreed with the Dealership, just the loan amount alone was in fact approximately $24,000.

222. Plaintiffs asked NMAC if there was any way in which NMAC could correct the papers.

223. NMAC told plaintiffs, no, that NMAC could not correct the papers and that plaintiffs would have to speak with the Dealership about any loan issue.

224. Plaintiffs then asked NMAC, in order that NMAC would not negatively affect their credit, whether NMAC would allow them to hold off on making any loan payment until the Dealership fixed the problem with the loan numbers.

225. NMAC told plaintiffs no, that NMAC could not allow them to stop the loan payments until the problem with loan amount was fixed.

226. NMAC further told plaintiffs that the account was open and would

remain open, that the contract was a legal document and that plaintiffs would have to speak to the Dealership about any loan issues they were having.

227.    Plaintiffs did not find all the pages of the RIC in the envelope which Sina gave to them on April 30, 2021, therefore plaintiffs obtained a copy of the RIC from NMAC.

228.    A copy of the RIC which plaintiffs obtained from NMAC is attached hereto as **Exhibit 10**.

229.    When plaintiffs reviewed Exhibit 10 they noticed that the "Date of Contract" on the RIC was "05/06/2021".

230.    Plaintiffs did not visit the Dealership on May 6, 2021.

231.    Plaintiffs did not sign any papers pertaining to the Vehicle on May 6, 2021.

232.    The sole date on which plaintiffs signed papers pertaining to the Vehicle was on April 30, 2021.

233.    Plaintiffs' signatures on Exhibit 10 are false.

234.    Plaintiffs' signatures on Exhibit 10 are fraudulent.

235.    Plaintiffs believe May 6, 2021 was the day that NMAC received the loan documents from the Dealership.

236.    May 6, 2021 was the day that NMAC received the loan documents from the Dealership.

237.    May 6, 2021 was the day that the Dealership sent the loan documents to NMAC.

238. This means that when plaintiffs visited the Dealership on May 5, 2021 to complain about the loan, the Dealership had not yet sent the loan documents to NMAC.

239. When plaintiffs visited the Dealership on May 5, 2021, the Dealership had not yet sent the loan documents to NMAC.

240. In order to avoid NMAC destroying their credit rating, plaintiffs have been dutifully repaying the loan on the Vehicle to NMAC.

241. Defendants' afore-mentioned fraud and deception have so far caused plaintiffs to spend thousands of dollars more for the Vehicle than they would otherwise have had to spend.

242. Due to defendants' afore-mentioned misconduct plaintiffs have experienced a sense of suspicion and distrust of others, a sense of having been taken advantage of and abused, a rise in their blood pressure due to emotional anxiety, worry, inability to sleep, inability to concentrate, loss of time, loss of money and loss of the value of money.

243. Plaintiff Ambonique Thomas is enrolled in college pursuing studies in computer science with the intention of alleviating, to her own small extent, our nation's problem with insufficient workers qualified in this essential field of endeavor.

244. Due to defendants' afore-mentioned misconduct, plaintiff Ambonique Thomas has been unable to pay her college tuition fees in the way she would have liked, since plaintiffs are now obliged to pay a higher monthly loan payment to NMAC than they would have had to absent defendants' fraud.

ALLEGATIONS AGAINST THE DEALERSHIP

AS AND FOR A FIRST CAUSE OF ACTION

TILA–15 U.S.C. § 1638(a)

(Misstatements Of TILA Disclosures)

245.    Plaintiffs re-alleges paragraphs 1-244 as if fully re-stated herein.

246.    The amount financed disclosed on the RIC is $24,681.90.

247.    The Dealership fraudulently and deceptively increased the amount financed to $24,681.90 by increasing the cash price to $25,139.98.

248.    Plaintiff did not have the actual use of $24,681.90 of loan.

249.    The RIC materially misstates the amount financed for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z, 12 C.F.R. § 226.17.

250.    The finance charge disclosed in Exhibit 9 is $1,607.70.

251.    The finance charge disclosed in Exhibit 9 of $1,607.70 does not include the fraudulent price increase of at least $6,730 which the Dealership added to the transaction only because plaintiffs purchased the Vehicle on credit and which would not have been added had plaintiffs purchased the Vehicle in a cash transaction.

252.    The actual finance charge imposed by Exhibit 9 includes the hidden and fraudulent amount of at least $6,730 charged by the Dealership incident to the extension of credit.

253.     Exhibit 9 therefore materially misstates the finance charge for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, 12 C.F.R. § 226.17.

254.     The annual percentage rate disclosed in Exhibit 9 is 2.490%.

255.     By 15 U.S.C. § 1638(a)(4), the annual percentage rate is the finance charge expressed as a percentage.

256.     Because the finance charge disclosed on the RIC is materially misstated, the annual percentage rate is also materially misstated.

257.     The actual annual percentage rate imposed by the RIC is substantially greater than the 2.490%.disclosed in Exhibit 9.

258.     Exhibit 9 materially misstates the annual percentage rate for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z, 12 C.F.R. § 226.17.

259.     The total of payments disclosed on the RIC is $26,289.60.

260.     By 15 U.S.C. § 1638(a)(5), the total of payments is the sum of the amount financed and the finance charge.

261.     Because both the amount financed and the finance charge disclosed in Exhibit 9 are materially misstated, the total of payments is also materially misstated.

262.     Exhibit 9 materially misstates the total of payments for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(5) and Regulation Z, 12 C.F.R. § 226.17.

263.     The total sale price disclosed in Exhibit 9 is $34,739.60.

264. By 15 U.S.C. § 1638(a)(7), the total sale price is the total of the cash price, additional charges and the finance charge.

265. Because the cash price and the finance charge disclosed on the RIC are materially misstated, the total sale price is also materially misstated.

266. Exhibit 9 materially misstates the total sale price for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(7) and Regulation Z, 12 C.F.R. § 226.17.

267. Plaintiffs would not have purchased the Vehicle had the imposed amount financed, finance charge, annual percentage rate, total of payments and total sale price been disclosed to them by the Dealership.

268. The Dealership is liable to plaintiffs in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

269. The Dealership acted willfully and knowingly in its misconduct herein.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

TILA–15 U.S.C. § 1638(b)

(Failure To Provide TILA Disclosures Prior To Consummation)

270. Plaintiffs re-allege paragraphs 1-269 as if fully re-stated herein.

271. The TILA disclosures were contained in the RIC.

272. Except for the RIC, the TILA disclosures were not included in any

document which the Dealership provided to plaintiffs.

273.    Sina did not provide plaintiffs with the TILA disclosures before Sina had plaintiffs sign documents.

274.    Sina obliged plaintiff to sign documents without first providing to plaintiffs a copy of the TILA disclosures in a form plaintiffs could keep.

275.    In fact, Sina did not inform plaintiffs of the contents of the documents which she was obliging plaintiffs to sign.

276.    Sina did not give any documents to plaintiff in a form they could keep, or at all, before she obliged plaintiffs to sign documents.

277.    The Dealership failed to give plaintiffs a copy of the required TILA disclosures in a form they could keep prior to the consummation of the transaction.

278.    Had the Dealership provided plaintiffs with a copy of the required TILA disclosures prior to the consummation of the transaction, plaintiffs would not have purchased the Vehicle.

279.    The Dealership failed to provide plaintiffs with a copy of the required TILA disclosures in a form they could keep, or at all, prior to the consummation of the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b).

280.    The Dealership is liable to plaintiffs in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

281.    The Dealership acted willfully and knowingly in its misconduct

herein.

WHEREFORE, plaintiffs respectfully pray that judgment be entered against defendants as follows:

(a)     awarding twice the finance charge, actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640 as against The Dealership;

(b)     awarding actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 2310;

(c)     awarding actual damages and reasonable attorneys' fees, costs and disbursements pursuant to NYVTL § 417 and the regulations thereunder;

(d)     awarding actual, compensatory and punitive damages for common-law fraud in an amount to be determined at the time of trial;

(e)     enjoining each defendant from committing further deceptive acts and practices towards plaintiff, pursuant to NYGBL § 349;

(f)     awarding actual damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(g)     in the alternative to (f), awarding statutory damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(h)    awarding treble damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(i)    awarding punitive damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(j)    awarding reasonable attorneys' fees, costs and disbursements pursuant to NYGBL § 349(h);

(k)    awarding actual, compensatory and punitive damages for conversion;

(l)    awarding damages for unjust enrichment;

(m)    awarding damages for money had and received;

(n)    awarding relief under MVRISA and reasonable attorneys' fees, costs and disbursements;

(o)    awarding pre-judgment interest; and

(p)    for such other and further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
      May 2, 2022.


                                   */s/  Novlette R. Kidd*
                                   NOVLETTE R. KIDD, ESQ. (NK 9339)
                                   FAGENSON & PUGLISI, PLLC
                                   Attorneys for Plaintiffs
                                   450 Seventh Avenue, Suite 704
                                   New York, New York 10123
                                   Tel.: (212) 268-2128
                                   Nkidd@fagensonpuglisi.com